## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

CLIFFORD J. CHURCH and RANDA A. HUSAIN, on behalf of themselves and those similarly situated,

*Plaintiffs,*

v.

COLLECTION BUREAU OF THE HUDSON VALLEY, INC.; and JOHN DOES 1 to 10,

*Defendant.*

Civil Action No. 20-3172(MEF)(LDW)

**OPINION**

### Table of Contents

I.    Background
      A. Procedural History
      B. Allegations
      C. The Motion
II.   The Legal Issue
      A. Standing: In General
      B. Standing: This Case
      C. The Defendant's Motion and the Plaintiffs' Response
      D. The Court's Approach
III.  Unreasonable Debt Collection
      A. Elements
      B. The Plaintiffs' Evidence
            1. The Two Unreasonable Debt Collection Cases
            2. The Other Eight Cases
                a) Libel
                b) Publicity Given to Private Life

        c) <u>Intentional Infliction of Emotional Distress</u>

        d) <u>Physical Injury</u>

  C. <u>Conclusion: The Tort is 70 Years Old, and Established in One Jurisdiction</u>

IV. <u>Is Unreasonable Debt Collection "Traditionally Recognized"?</u>

  A. <u>Longevity</u>

    1. <u>The Cases</u>

    2. <u>What Can be Taken from the Cases</u>

  B. <u>Prevalence</u>

    1. <u>Sprint Communications</u>

    2. <u>Method</u>

    3. <u>"American Courts"</u>

    4. <u>Conclusion: Unreasonable Debt Collection is Not Prevalent Enough</u>

V. <u>Conclusion</u>

\*　　\*　　\*

A debt collector said it might report two people to credit agencies if they did not take certain steps.

The people sued under a federal statute.

The debt collector now moves to dismiss, arguing that because the people were not injured the Court does not have jurisdiction.

The motion will be granted.

\*　　\*　　\*

I. <u>Background</u>

  A. <u>Procedural History</u>

In March of 2020, two people (the "Plaintiffs"[1]) sued a debt collector (the "Defendant"[2]) on behalf of a putative class.

In November of 2022, the Court certified the class.

In May of 2023, the Defendant moved to dismiss.  The motion was fully briefed as of late June, and it is now before the Court.[3]

### B. Allegations

The allegations as relevant for now are as follows.

The Plaintiffs each received a debt collection letter from the Defendant.  See Complaint ¶¶ 20-21.

According to the letter, the Defendant might "take additional collection efforts" if there was no response to the letter within seven days.  Complaint ¶¶ 23, 28; Exs. A, B.  These "efforts," according to the letter, could include sending "a negative credit report[.]"  Complaint ¶¶ 23, 28.

The Plaintiffs' core allegation: the letters were deceptive, because the Defendant had a policy of credit reporting at 60 days, not seven.  See Complaint ¶ 26.  Therefore, the Plaintiffs argue, sending the letter violated the Fair Debt Collection Practices Act.[4]  See id. ¶¶ 1-2, 27, 41-49.

### C. The Motion

As noted, the Defendant has moved to dismiss.  It contends the Plaintiffs suffered no "concrete" injury and therefore do not

---

[1]  The Plaintiffs are Clifford J. Church and Randa A. Husain.

[2]  The Defendant is Collection Bureau of the Hudson Valley, Inc. The caption also lists 10 "John Doe" defendants.  They have not been identified by the Plaintiffs or served.  They are not considered by the Court here.

[3]  This case was re-assigned to the undersigned on May 25, 2023.

[4]  The Act: "A debt collector may not use any false, deceptive, or misleading representation . . . in connection with the collection of any debt. . . . [T]he following conduct is a violation of this section: . . . . The threat to take any action that . . . is not intended to be taken."  15 U.S.C. § 1692e(5).

have standing to bring this case.  See Motion to Dismiss at 6-17.

The core legal issue raised by the motion is discussed below, in Part II.A, Part II.B, and Part II.C.  In Part II.D, the Court sets out its approach to the issue.

## II.   The Legal Issue

### A. Standing:  In General

Federal courts exercise the "judicial Power of the United States[.]"  U.S. Constitution, Article III.  That power "extends only to 'Cases' and 'Controversies[.]'"  Spokeo, Inc. v. Robins, 578 U.S. 330, 337 (2016) (quoting Article III).  In turn, "a case or controversy can exist only if a plaintiff has standing to sue[.]"  United States v. Texas, 599 U.S. 670, 675 (2023).

There are a few elements of standing.  See Spokeo, 578 U.S. at 338.  One is the Plaintiff suffered a "concrete injury."  Id. at 339.

In some contexts, showing a "concrete injury" is straightforward.

Take, for example, a person who gets a deceptive debt collection letter, like the Plaintiffs allegedly received here.  The letter might cause the recipient to make a payment she otherwise would not have.  That could amount to a concrete injury.[5]  Or the letter might hurt the recipient's reputation if shared with others, or it might deeply upset the recipient.  These, too, could potentially count as concrete injuries.[6]

### B. Standing:  This Case

This case, though, is different than the ones discussed just above.

Here, the Plaintiffs allege they received a deceptive letter. But there are no allegations they made a payment based on it, or

---

[5]  See, e.g., Huber v. Simon's Agency, Inc., 84 F.4th 132, 149 (3d Cir. 2023) (extra payment by plaintiff: concrete injury).

[6]  See, e.g., Ewing v. MED-1 Sols., LLC, 24 F.4th 1146, 1153 (7th Cir. 2022) (reputational harm: concrete injury); Magruder v. Cap. One, Nat'l Ass'n, 540 F. Supp. 3d 1, 9-10 (D.D.C. 2021) (emotional distress: concrete injury).

incurred out-of-pocket costs.  There is nothing to say they were embarrassed or distressed by the letter, or that anyone publicized the letter, perhaps hurting the Plaintiffs' reputation or credit score.

Rather, the Plaintiffs allege they received the letter, passed it on to a lawyer, and --- nothing else.  In short: the Plaintiffs do not contend the letter harmed or injured them in any way.

### C. The Defendant's Motion and the Plaintiffs' Response

Against this backdrop, the Defendant has moved to dismiss for lack of standing.[7]

At first glance, the motion looks like one to grant.  This Court has held, more than 20 times, that there is no standing in no-injury scenarios analogous to the one at issue here.[8]

---

[7]  The motion is under Rule 12(b)(1), which permits motions to dismiss for "lack of subject-matter jurisdiction."  Fed. R. Civ. P. 12(b)(1).  Because "standing is a jurisdictional matter," a "motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1)."  Ballentine v. United States, 486 F.3d 806, 810 (3d Cir. 2007).  In assessing a Rule 12(b)(1) motion, a court "has to first determine" whether the motion is "facial" or "factual."  Const. Party of Pennsylvania v. Aichele, 757 F.3d 347, 358 (3d Cir. 2014).  A facial motion is decided on the allegations in the complaint.  A factual motion is decided on the evidence put forward by the parties.  See id.  Here, the parties have offered evidence.  See Motion to Dismiss, Exs. D-E; Opposition to Motion to Dismiss, Decls. of Randa A. Husain and Mohamad K. Mohamad.  But neither the evidence nor the allegations in the complaint suggest harm.  This case is therefore the same whether the motion to dismiss is thought of as facial or factual.  The Court, though, must make a choice, and will treat the motion as facial, to allow the Plaintiffs the chance to later build a fuller record here, should they wish to.

[8]  See Valentine v. Mullooly, Jeffrey, Rooney & Flynn LLP, 2023 WL 4867398 (D.N.J. July 31, 2023); Rodriguez v. Awar Holdings, Inc., 2023 WL 4362729 (D.N.J. July 6, 2023); Jones v. JHPDE Fin. I, LLC, 2023 WL 4287616 (D.N.J. June 30, 2023); Winter v. Resurgent Cap. Servs. L.P., 2023 WL 3431215 (D.N.J. May 12, 2023); Lespes v. Monarch Recovery Mgmt., Inc., 2023 WL 4060183 (D.N.J. Apr. 14, 2023), report and recommendation adopted, 2023

But the Plaintiffs look to sidestep these cases by pressing a novel argument.  See Opposition to Motion to Dismiss at 15.

To understand the argument, step back for a moment.

In TransUnion LLC v. Ramirez, 594 U.S. __, 141 S. Ct. 2190, 2204 (2021), the Supreme Court explained how standing's "concrete injury" requirement can be satisfied where, as here, there are no allegations of any tangible harms to the plaintiff.

> Various intangible harms can . . . be concrete.  Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.  Those include, for example, reputational harms, disclosure of private information, and intrusion upon seclusion.  And those traditional harms may also include harms specified by the Constitution itself.
>
> In determining whether a harm is sufficiently concrete to qualify as an injury in fact, the Court [has] . . . said that Congress's views may be instructive.  Courts must afford due respect to Congress's decision to impose a

---

WL 4060255 (D.N.J. May 3, 2023); Chapman v. AA Action Collection Co., 2023 WL 2020037 (D.N.J. Feb. 15, 2023); Nuamah-Williams v. Frontline Asset Strategies, LLC, 2023 WL 1470057, at *2 (D.N.J. Feb. 2, 2023); Levins v. Healthcare Revenue Recovery Grp., LLC, 2023 WL 416077 (D.N.J. Jan. 26, 2023); Jackson v. I.C. Sys., Inc., 2023 WL 157517 (D.N.J. Jan. 11, 2023); Valentine v. Unifund CCR, LLC, 2023 WL 22423 (D.N.J. Jan. 3, 2023); Rodriguez-Ocasio v. I.C. Sys., Inc., 2022 WL 16838591 (D.N.J. Nov. 8, 2022); Rabinowitz v. Alltran Fin. LP, 2022 WL 16362460 (D.N.J. Oct. 25, 2022); Duncan v. Sacor Fin., Inc., 2022 WL 16722236 (D.N.J. Oct. 19, 2022), report and recommendation adopted, 2022 WL 16716085 (D.N.J. Nov. 4, 2022); Lahu v. I.C. Sys., Inc., 2022 WL 6743177 (D.N.J. Oct. 11, 2022); Daye v. GC Servs. Ltd. P'ship, 2022 WL 4449381 (D.N.J. Sept. 23, 2022); Sandoval v. Midland Funding, LLC, 2022 WL 3998294 (D.N.J. Sept. 1, 2022); Foley v. Medicredit, Inc., 2022 WL 3020129 (D.N.J. July 29, 2022); Schultz v. Midland Credit Mgmt., Inc., 617 F. Supp. 3d 249 (D.N.J. 2022); Madlinger v. Enhanced Recovery Co., LLC, 2022 WL 2442430 (D.N.J. July 5, 2022); Vaughan v. Fein, Such, Kahn & Shepard, P.C., 2022 WL 2289560 (D.N.J. June 24, 2022); Rohl v. Pro. Fin. Co., Inc., 2022 WL 1748244 (D.N.J. May 31, 2022); Oh v. Collecto, Inc., 2021 WL 3732881 (D.N.J. Aug. 23, 2021).

statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of that statutory prohibition or obligation.  In that way, Congress may elevate to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law.  But even though Congress may elevate harms that exist in the real world before Congress recognized them to actionable legal status, it may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is.

Id. at 2204-05 (internal quotation marks, citations, and parentheticals removed); see also Huber, 84 F.4th at 148-49.

In short: when a "tradition[al]" injury in the law is "elevated" by a statute, certain violations of the statute, even if they only cause intangible harms, can create a "concrete injury" of the sort that can be a basis for standing.

For example, the tort of intrusion upon seclusion has long been burrowed deep in American law.  See William L. Prosser, Privacy, 48 Cal. L. Rev. 383, 389-90 (1960) (hereafter "Prosser, Privacy").  The harms associated with the tort were boosted up by Congress, when it passed the Telephone Consumer Protection Act.  And when the Act is violated in ways that bear enough of a relationship to intrusion upon seclusion, a plaintiff can be concretely injured and therefore have standing.  See Susinno v. Work Out World Inc., 862 F.3d 346, 351-52 (3d Cir. 2017).

Come back now to this case, and the Plaintiffs' argument.

The Plaintiffs argue: (1) there was a "tradition[al]" anchor tort called unreasonable debt collection, see Opposition to Motion to Dismiss at 17, (2) it was "elevated" by Congress by the Fair Debt Collection Practices Act, see id. at 23-24, and (3) simple receipt of an allegedly deceptive letter, without more, violates the Act in a way that is closely-enough related to the traditional tort --- such that the Plaintiffs have a "concrete injury" here, and can therefore establish standing. See id. at 29-30.[9]

---

[9]  The Plaintiffs' argument is focused exclusively on establishing the existence of the anchor tort of unreasonable debt collection (number (1) in the text) and then teasing out its implications for the standing analysis (numbers (2) and (3)

### D. **The Court's Approach**

To evaluate the Plaintiffs' three-part argument, the Court begins at step one, by assessing whether there is a traditional tort of unreasonable debt collection.

First, the Court defines the tort and establishes based on the Plaintiffs' evidence how old and how widespread it is.  <u>See</u> Part III.

The Court then asks: given its longevity and prevalence, does the tort count as traditional?  The Court's answer: no.  <u>See</u> Part IV.

The implication of all this: the Plaintiffs have not established standing.  <u>See</u> Part V.

### III. **Unreasonable Debt Collection**

As noted above, the traditional tort put forward by the Plaintiffs is unreasonable debt collection.

To start assessing whether it is traditional, the Court outlines its elements, <u>see</u> Part III.A, and concludes that on the Plaintiff's evidence the tort is about 70 years old and exists in one jurisdiction.  <u>See</u> Parts III.B and III.C.

### A. **Elements**

That tort has four elements.[10]

---

in the text).  (To see this, refer to Appendix A, which collects references to the Plaintiffs' brief.)  The Plaintiffs do not make any other argument.  Establishing the existence of a traditional <u>cause of action</u> is the Plaintiff's sole focus.  Not, for example, establishing the existence of traditional <u>harms</u> that various causes of action might address under different legal headings, and that Congress then "elevated" with the Fair Debt Collection Practices Act.  The Court addresses the argument the Plaintiffs make, not others.  <u>Cf</u>. <u>Perez</u> v. <u>McCreary,</u> <u>Veselka, Bragg & Allen, P.C.</u>, 45 F.4th 816, 825 (5th Cir. 2022).

[10]  A caution at the start.  Some of the tort's elements "are not clearly defined and the conduct deemed to constitute an unreasonable collection effort varies from case to case."  <u>EMC</u> <u>Mortg. Corp.</u> v. <u>Jones</u>, 252 S.W.3d 857, 868 (Tex. App. 2008) (compiling varying cases); <u>see</u> <u>also</u> <u>Souto</u> v. <u>Bank of Am., N.A.,</u> 2012 WL 3638024, at *6 (S.D. Tex. Aug. 22, 2012); <u>B.F. Jackson,</u>

First, the defendant "made unreasonable collection efforts against [the plaintiff]." Moore v. Savage, 359 S.W.2d 95, 96 (Tex. Civ. App. 1962), writ refused NRE, 362 S.W.2d 298 (Tex. 1962). "'[U]nreasonable collection efforts' . . . means such efforts as a person of ordinary care and prudence would not have used under the same or similar circumstances." Montgomery Ward & Co. v. Brewer, 416 S.W.2d 837, 838 (Tex. Civ. App. 1967), writ refused NRE (Nov. 15, 1967); see also id. (cleaned up) (defining unreasonable collection efforts as "a course of harassment on the part of a creditor which is willful, wanton and malicious and is intended to inflict mental anguish and resulting bodily harm").

Second, the defendant undertook unreasonable collection efforts with "reckless disregard of the health and welfare of plaintiff." Martin, A Creditor's Liability, at 128-29 (citing Moore, 359 S.W.2d 95).

Third, the unreasonable collection efforts "were a proximate cause of . . . physical illness and mental and emotional pain." Moore, 359 S.W.2d 95; see also Kruse v. Bank of New York Mellon, 2012 WL 13094122, at *8 (N.D. Tex. June 22, 2012); cf. Donald v. Bennett, 674 F.2d 1080, 1089 (5th Cir. 1982), on reh'g, 679 F.2d 415 (5th Cir. 1982).[11]

---

Inc. v. CoStar Realty Info., Inc., 2009 WL 1812922, at *5 (S.D. Tex. May 20, 2009). This is in part because the tort was first articulated in Texas, see Boe W. Martin, A Creditor's Liability for Unreasonable Collection Efforts: The Evolution of a Tort in Texas, 9 S. Tex. L.J. 127, 132 (1966) (hereafter "Martin, A Creditor's Liability"), and "[t]he Supreme Court of Texas has not directly addressed the elements to be proven in an action for unfair collection practices." Hidden Forest Homeowners Ass'n v. Hern, 2011 WL 6089881, at *4 (Tex. App. Dec. 7, 2011).

[11]  The Plaintiffs argue that unreasonable debt collection is an intentional tort, and the law therefore "provides a remedy in the form of nominal damages . . . without proof of any other harm[.]"  Opposition to Motion to Dismiss at 23.  But the Plaintiffs have not put forward unreasonable debt collection cases that say this.  The two Texas cases cited by the Plaintiffs involved allegations of actual harm.  See Pullins v. Credit Exch. of Dallas, Inc., 538 S.W.2d 681, 682 (Tex. Civ. App. 1976), writ refused NRE (Dec. 31, 1976); Marshall, 347 S.W.2d at 623.  So, too, other Texas cases.  See e.g., Moore, 359 S.W.2d at 96; cf. Donald, 674 F.2d at 1088; see also Martin,

<u>Fourth</u>, the defendant intended such harm.  <u>See</u> <u>Moore</u>, 359 S.W.2d at 96 (requiring intent to cause harm); <u>Montgomery Ward & Co.</u> v. <u>Brewer</u>, 416 S.W.2d 837, 838 (Tex. Civ. App. 1967), <u>writ refused NRE</u> (Nov. 15, 1967) (basing decision in part on lack of intent to cause harm).[12]

### B. The Plaintiffs' Evidence

As noted in Part II.C, the Plaintiffs' argument rests on the premise that unreasonable debt collection is a traditional tort.

To show that it is, the Plaintiffs put forward ten cases, said to represent "examples of actionable claims arising from this tort."  Opposition to Motion to Dismiss at 18.

This section analyzes the ten cases.

### 1. The Two Unreasonable Debt Collection Cases

Two of the ten cases, each from Texas, involve the tort of unreasonable debt collection.  These are <u>Pullins</u> v. <u>Credit Exch. of Dallas, Inc.</u>, 538 S.W.2d 681 (Tex. Civ. App. 1976), <u>writ refused NRE</u> (Dec. 31, 1976) and <u>Marshall</u> v. <u>United Fin. & Thrift</u>

---

<u>A Creditor's Liability</u>, at 131 (actual damages are "essential to the existence of this tort").  Indeed, the Texas Supreme Court case that established the tort, <u>see</u> Martin, <u>A Creditor's Liability</u>, at 131-32, held liability exists when the relevant conduct "has the intended effect of causing great mental anguish to the debtor, resulting in physical injury[.]"  <u>Duty</u> v. <u>Gen. Fin. Co.</u>, 154 Tex. 16, 20 (1954).  And the Texas Supreme Court itemized alleged "injuries" caused by the defendants in that case, including: physical injury; psychological/emotional impacts; and being "discharged from  . . . work[.]"  <u>Id</u>. at 19.  All of this suggests the possibility that even if unreasonable debt collection efforts is a traditional tort, that may not in the end help the Plaintiffs' standing argument.  This is because the tort seems to require actual harm.  But harm is precisely what the Plaintiffs have not plead.

[12]  As noted, the elements are not drawn with perfect sharpness.  For example, some Texas courts seem to suggest intent to harm is required.  <u>See</u> <u>Moore</u>, 359 S.W.2d at 96; <u>Montgomery Ward & Co.</u>, 416 S.W.2d at 838.  Others do not.  <u>See</u> <u>Employee Fin. Co.</u> v. <u>Lathram</u>, 363 S.W.2d 899, 901 (Tex. Civ. App. 1962,), <u>rev'd on other grounds</u>, 369 S.W.2d 927 (Tex. 1963) (seeming to require only negligence, as determined in light of the ordinary care standard).

*Corp.*, 347 S.W.2d 623 (Tex. Civ. App. 1961).  These cases trace
back to a 1954 Texas Supreme Court case, *Duty* v. *Gen. Fin. Co.*,
154 Tex. 16.  That 1954 case first established the tort.  See
Martin, *A Creditor's Liability*, at 131.

### 2. The Other Eight Cases

The Plaintiffs' remaining eight cases do not mention
unreasonable debt collection.  They do not cite the Texas cases,
or any cases that invoke unreasonable debt collection.

In short: the Plaintiffs' remaining eight cases do not appear to
have a connection to the tort of unreasonable debt collection.

A closer look, as set out just below, emphasizes the point.

### a. Libel

Three of the Plaintiffs' eight cases are libel cases.  See
Opposition to Motion to Dismiss at 18-21 (citing *Thompson* v.
*Adelberg & Berman, Inc.*, 181 Ky. 487 (1918), *Muetze* v. *Tuteur*,
77 Wis. 236 (1890), *Woodling* v. *Knickerbocker*, 31 Minn. 268
(1883)).

The elements of libel, from around the period of the cited
cases: (1) "an unprivileged publication" (2) "of false and
defamatory matter of another which" (3)(a) "is actionable
irrespective of special harm, or (b) if not so actionable, is
the legal cause of special harm to the other."  Restatement
(First) of Torts § 558 (1938).

But there is no overlap between these elements and the four
elements of the tort of unreasonable debt collection, as set out
above in Part III.A.  Libel and unreasonable debt collection are
not yoked together.  Instead, they have no meaningful
connection.

### b. Publicity Given to Private Life

One of the eight cases cited by the Plaintiffs is a Kentucky
case that invoked a right of privacy.  See Opposition to Motion
to Dismiss at 20-21 (citing *Brents* v. *Morgan*, 221 Ky. 765
(1927)).

The common law right to privacy encompasses multiple torts.[13]
The Kentucky case concerned one of these, the "publicity given

---

[13]  The Restatement (Second) outlines four: intrusion upon

to private life" tort.  The elements of that tort: "1) giving
publicity; 2) to private facts; 3) of a kind highly offensive to
a reasonable person; and 4) which are not of legitimate concern
to the public."  Bowley v. City of Uniontown Police Dep't, 404
F.3d 783, 788 n.7 (3d Cir. 2005) (cleaned up) (applying
Pennsylvania law); cf. Restatement (Second) of Torts § 652D
(1977) (outlining similar elements).

But none of these elements are also among the elements of
unreasonable debt collection.  The torts are not linked.

### c. Intentional Infliction of Emotional Distress

Three of the eight cases cited by the Plaintiffs concern
intentional infliction of emotional distress.  See Opposition to
Motion to Dismiss at 18, 21-22 (citing Clark v. Associated
Retail Credit Men of Washington, D.C., 105 F.2d 62 (D.C. Cir.
1939); La Salle Extension Univ. v. Fogarty, 126 Neb. 457 (1934);
Barnett v. Collection Serv. Co., 214 Iowa 1303 (1932)).

The generally-recognized elements of intentional infliction of
emotional distress: "(1) defendants acted intentionally or
recklessly, both in doing the act and producing the emotional
distress; (2) defendants' conduct was outrageous and extreme, so
as to go beyond all bounds of decency and be utterly intolerable
in a civilized community; (3) defendants' actions were the
proximate cause of the plaintiff's emotional distress; and (4)
the distress suffered was so severe that no reasonable person
could be expected to endure it."  Kounelis v. Sherrer, 529 F.
Supp. 2d 503, 532 (D.N.J. 2008) (applying New Jersey law); cf.
Restatement (Second) of Torts § 46 (1965) (outlining similar
elements).

These elements do not meaningfully overlap with the elements of
unreasonable debt collection.  Unreasonable debt collection, for
example, requires a connection to debt collection efforts.  See
Moore, 359 S.W.2d at 96.  Intentional infliction of emotional
distress does not.  Intentional infliction of emotional distress

---

seclusion, appropriation of name or likeness, publicity given to
private life, or publicity placing persons in false lights.  See
Restatement (Second) of Torts § 652 (1977); see also Boring v.
Google Inc., 362 F. App'x 273, 278 (3d Cir. 2010) (recognizing
similar torts under Pennsylvania law); Conserve v. City of
Orange Twp., 2021 WL 3486906, at *6 (D.N.J. Aug. 9, 2021)
(recognizing similar torts under New Jersey law).

requires both extreme conduct by the defendant[14] and an impact on the plaintiff "so severe that no reasonable person could be expected to endure it." Kounelis, 529 F. Supp. 2d at 532.  The unreasonable debt collection tort is actionable based on much less egregious conduct from the defendant, and a much less hard landing on the plaintiff.

### d. Physical Injury

The last case put forward by the Plaintiffs is based on the tort of physical injury caused by a wrongful act.  See Opposition to Motion to Dismiss at 20 (citing Engle v. Simmons, 148 Ala. 92, 94 (1906)).  That tort is not crisply defined, but it appears related to intentional infliction of emotional distress, with an added element of physical harm.  See Engle, 148 Ala. at 94.  But as noted above, unreasonable debt collection is far afield from intentional infliction of emotional distress.  Adding a physical injury requirement does not change the picture.

### C. Conclusion: The Tort is 70 Years Old, and Established in One Jurisdiction

As set out above, there is a tort called unreasonable debt collection, see Part III.A, and to show it is traditional, the Plaintiffs come forward with ten cases.

But eight of these cases concern torts that have no meaningful connection to unreasonable debt collection.  See Part III.B. Those eight cases are therefore irrelevant here, and must be put to the side.

That leaves behind a tort reflected in two cases, one from Texas in 1961 and one from Texas in 1976.  These two cases, as noted, trace back to a 1954 Texas Supreme Court case.[15]

---

[14]  New Jersey law refers to this as "extreme and outrageous" conduct.  Buckley v. Trenton Saving Fund Soc., 111 N.J. 355, 366 (1988).  The online version of the Restatement (Second) calls it "severe or outrageous conduct," and defines it as "conduct [which] has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  Restatement (Second) of Torts § 46 cmt. D (2023).

[15]  The Court does not look beyond the Plaintiffs' ten cases. This is for two reasons.  First, "[c]ourts are . . . entitled to decide a case based on the historical record compiled by the

## IV.  Is Unreasonable Debt Collection "Traditionally Recognized"?

Does a tort that has existed in one state (Texas) for about 70 years (since 1954) count as "traditionally recognized as providing a basis for lawsuits in American courts?"  TransUnion, 141 S. Ct. at 2204.

That is the question teed-up by the Plaintiffs' argument[16] and cases.[17]  This Part answers it.

### A. Longevity

---

parties[.]"  New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. __, 142 S. Ct. 2111, 2130 n.6 (2022); see also Safari v. Whole Foods Mkt. Servs., Inc., 2023 WL 5506014, at *8 (C.D. Cal. July 24, 2023) (applying this principle to a history-focused Article III standing inquiry); see generally, e.g., Greenlaw v. United States, 554 U.S. 237, 244 (2008) ("[o]ur adversary system is designed around the premise that the parties . . . are responsible for advancing the . . . arguments entitling them to relief") (cleaned up).  Second, the Court's role here is not to "say what the law [of unreasonable debt collection] is."  Marbury v. Madison, 5 U.S. 137, 177 (1803).  (Where its role is saying what the law is, the Court is not quite so tightly tethered to what a party may have said about the law's content.)  Rather, the Court here must assess whether the Plaintiffs have carried their standing burden, see Spokeo, 578 U.S. at 338, by means of the ten cases they have offered to establish that the tort of unreasonable debt collection is traditional.  These ten cases work as the Plaintiffs' evidence of how traditional the tort is.  That evidence, like virtually all other evidence, is to be assessed as presented by the parties.  See, e.g., Greenlaw, 554 U.S. at 243 ("In our adversary system, . . . we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.").  The evidence is not to be yeasted up by further research on the part of the Court. And that is true whether that research would be factual (as would be the case with most evidence) or legal (as it would be here).

[16]  See footnote 9 above.

[17]  See footnote 15 above.

One common sense aspect of something being "traditional" is that it is at least somewhat old.[18] "[H]ow old must a common-law tort be in order to qualify as having been traditionally . . . regarded as providing a basis for a lawsuit in English or American courts"? Sierra v. City of Hallandale Beach, Fla., 996 F.3d 1110, 1121 (11th Cir. 2021) (Newsom, J., concurring) (cleaned up).

On the sources put forward by the Plaintiffs, unreasonable debt collection is around 70 years old.  Is that old enough?[19]

To answer this question, the Court focuses on the relevant decisions, see Part IV.A.1 below, but tentatively concludes these are not clarifying enough here.  See Part IV.A.2 below.

### 1. The Cases

Since the Supreme Court's Spokeo decision, the Third Circuit has suggested to varying degrees that certain torts may potentially qualify as traditional for the Article III standing purposes at issue here.

Take these briefly, one at a time.

The first tort: unreasonable publicity given to another's private life.[20]  The foundational common law cases recognizing the tort are from the early 1900s.  See, e.g., Hinnen v. Meier & Frank Co., 166 Or. 482, 506 (1941) (compiling cases); Melvin v. Reid, 112 Cal. App. 285, 297 (1931); Brents, 221 Ky. at 771-73; Feeney v. Young, 181 N.Y.S. 481 (App. Div. 1920); Douglas v. Stokes, 149 Ky. 506 (1912); Pavesich v. New England Life Ins. Co., 122 Ga. 190 (1905); see generally Jonathan B. Mintz, The

---

[18]  See, e.g., Tradition, sense I.1.c, Oxford English Dictionary (2023) ("Any practice or custom which is generally accepted and has been established for some time within a society, social group, etc.") (emphasis added).

[19]  Neither the Supreme Court nor the Third Circuit has articulated a test that sorts torts that are old enough to count as traditional from torts that are not.  Cf. Sierra, 996 F.3d at 1121 (Newsom, J., concurring) (the question of how "old . . . a common-law tort [must] be in order to qualify . . . remain[s] largely unsettled").

[20]  See, e.g., Kamal v. J. Crew Grp., Inc., 918 F.3d 102, 114 (3d Cir. 2019).

Remains of Privacy's Disclosure Tort: An Exploration of the Private Domain, 55 Md. L. Rev. 425, 432 n.17 (1996).[21]

The second tort: breach of confidence.  The Third Circuit has discussed this as a potential traditional tort.  See Kamal, 918 F.3d at 114.  The tort runs back to the 19th century.  See Neil M. Richards & Daniel J. Solove, Privacy's Other Path: Recovering the Law of Confidentiality, 96 Geo. L.J. 123, 143 (2007).[22]

The third tort: intrusion upon seclusion.  The Third Circuit has held that this is a traditional tort,[23] and the tort traces back to the late 19th and early 20th centuries.  See Prosser, Privacy, at 389-90.[24]

The fourth: fraudulent misrepresentation.[25]  This tort predates the Founding and was widely recognized (sometimes by another name: deceit) in the United States in the 19th century.[26]

---

[21] As part of considering the "traditional" aspect of this tort, the Third Circuit has cited Section 652 of the Restatement (Second).  See Kamal, 918 F.3d at 114; Long v. Se. Pa. Transp. Auth., 903 F.3d 312, 324 (3d Cir. 2018).  Section 652 cites cases that date back as far as the 19th century.  See Restatement (Second) of Torts § 652A-E (1977).

[22] In this context, the Third Circuit cited, see Kamal, 918 F.3d at 114, a law review article, see Alan B. Vickery, Breach of Confidence: An Emerging Tort, 82 Colum. L. Rev. 1426 (1982).  The article traces the tort back to 19th century England and also cites examples of breach of confidence from the first half of the 20th century.  See Vickery, Breach of Confidence, 82 Colum. L. Rev. 1426, 1449-50, n.115-126, 1452, 1454 n.146.

[23] See Susinno, 862 F.3d at 351-2.

[24] As part of delineating the traditional contours of the tort, the Third Circuit cited, see Sussino, 862 F.2d at 351-52, the Restatement (Second).  The Restatement (Second), in relevant part, relies on cases that run back to the late 19th century.  See Restatement (Second) of Torts § 652B (1977).

[25] See Huber, 84 F.4th at 148.

[26] As part of considering whether this tort is traditional, the Third Circuit cited Section 525 of the Restatement (Second).  See Huber, 84 F.4 at 154.  The Restatement (Second), in relevant part, looks to cases starting from the late 19th century.  See

The fifth: abuse of process.  The Third Circuit has seemed to suggest this is a traditional tort, see Grasso v. Katz, 2023 WL 4615299, at *2 (3d Cir. July 19, 2023), and it dates back to the 19th century.  See Jeffrey J. Utermohle, Look What They've Done to My Tort, Ma: The Unfortunate Demise of "Abuse of Process" in Maryland, 32 U. Balt. L. Rev. 1, 6-7 (2002).[27]

Sixth and finally: unjust enrichment.  The Third Circuit has suggested this is traditionally recognized, see Glen v. Trip Advisor, LLC, 2022 WL 3538221, at *2 (3d Cir. Aug. 18, 2022), and proceeding on an unjust enrichment theory was well-established in American courts in the 18th and 19th centuries. See Chapter One, The Intellectual History of Unjust Enrichment, 133 Harv. L. Rev. 2077, 2083-4 (2020).

### 2. What Can be Taken from the Cases

As set out in the preceding section, the Third Circuit has suggested, to varying degrees, that a number of torts may count as traditional for the Article III standing analysis at issue in this case.

But each of these torts is at least 125 years old, and some are much older than that.

In some contexts, this might well be clarifying.  For example, if 125 is old enough, then a tort recognized 250 years ago would plainly seem to be old enough.

But on the Plaintiffs' evidence, unreasonable debt collection is around 70 years old.  See Part III.C above.  That makes the Third Circuit's decisions hard to lean on here for guidance. That a 125-year-old tort is old enough to be traditional does not, on its own, indicate whether a 70-year-old tort is old enough to count as traditional.  And the Third Circuit has not indicated that 125 (or any other "age") sets a minimum threshold of longevity that must be crossed before a tort can be chalked

---

Restatement (Second) of Torts § 525 (1977).

[27]  As part of its analysis, the Third Circuit cited the Handbook of the Law of Torts.  See Grasso, 2023 WL 4615299, at *2.  The Handbook, in turn, cites cases as old as the 19th century.  See 1 William L. Prosser, Handbook of the Law of Torts 892 (1941).

up as traditional.[28]

In short: the tort at issue here is about 70 years old, and the cases decided to this point do not provide a direct and definitive sense of whether a 70-year-old tort counts as traditional.[29]

---

[28]  The Supreme Court's cases do not shed more light.  They, too, concern torts substantially older than 70.  The Court has suggested defamation is traditional.  See TransUnion, 141 S. Ct. at 2208-09; Spokeo, 578 U.S. at 341-42.  But defamation is hundreds of years old.  See Van Vechten Veeder, The History and Theory of the Law of Defamation, 3 Colum. L. Rev. 546 (1903). The Supreme Court has also suggested intrusion upon seclusion is traditional.  See TransUnion, 141 S. Ct. at 2204.  But, as noted, that tort dates to the late 19th and early 20th centuries.  See Prosser, Privacy, at 389-90.  Finally, the Supreme Court has suggested that public disclosure of private facts (also called: unreasonable publicity given to another's private life) is a traditional tort.  See TransUnion, 141 S. Ct. at 2204.  But that dates to the early 20th century.  See Mintz, The Remains of Privacy's Disclosure Tort, 55 Md. L. Rev. 425. In short: all of these torts are substantially older than 70. Other federal cases are also not clarifying here.  Some examples: Farrell v. Blinken, 4 F.4th 124, 133-34 (D.C. Cir. 2021) (discussing a cause of action related to the right to expatriate, and tracing it back to the early 19th century) and Perry v. Newsom, 18 F.4th 622, 639-640 (9th Cir. 2021) (discussing a cause of action related to breach of contract in the absence of tangible harm, and tracing it back to before the Founding in England and to the early 19th century in the United States).

[29]  It might be suggested that a tort can be traditional only if it runs back to the Founding.  Cf. Buchholz v. Meyer Njus Tanick, PA, 946 F.3d 855, 871 (6th Cir. 2020) (Murphy, J., concurring in part and dissenting in part).  But the Supreme Court and Third Circuit have identified torts as traditional that were first articulated after the Founding.  Compare, e.g., TransUnion, 141 S. Ct. at 2204 (identifying intrusion upon seclusion as one such tort) and Susinno, 862 F.3d at 351-52 (same) with Prosser, Privacy, at 389-90 (tracing the tort back to the late 19th century).

In the absence of surer guideposts,[30] the Court does not continue

_____

[30] At first glance, another doctrine might be clarifying here.
To analyze the separation of powers, the Supreme Court has long
looked to the "gloss" of historical practice.  See, e.g.,
N.L.R.B. v. Noel Canning, 573 U.S. 513, 523 (2014); McCulloch v.
Maryland, 17 U.S. 316, 402 (1819); see generally Curtis A.
Bradley & Trevor W. Morrison, Historical Gloss and the
Separation of Powers, 126 Harv. L. Rev. 411, 412 (2012)
(collecting numerous cases).  The "law of Art[icle] III standing
is built on a single basic idea --- the idea of separation of
powers."  TransUnion, 141 S. Ct. at 2203 (cleaned up).  This
suggests gloss jurisprudence might have a role to play in the
standing analysis here --- because, per the Supreme Court,
standing is in essence a separation of powers question.  If
gloss jurisprudence is relevant here, note the Supreme Court has
indicated historical practice of much less than 70 years can be
relied on for "gloss."  See Dames & Moore v. Regan, 453 U.S.
654, 679 (1981) (29 years); The Pocket Veto Case, 279 U.S. 655,
689 (1929) (20 years).  If 29 years and 20 years are old enough,
is a 70-year-old tort old enough?  Probably not.  One of the
Supreme Court's core reasons for turning to historical gloss is
acquiescence, see Noel Canning, 573 U.S. at 546-47, when one of
the federal elected branches pursues a course of action that
impacts the power of the other, and the latter branch lets it
happen.  The gloss cases that look to less than 70 years of
historical practice are acquiescence cases.  See Dames & Moore,
453 U.S. at 684; The Pocket Veto Case, 279 U.S. at 688-690.  And
acquiescence may well be why, in those cases, the Supreme Court
was willing to reason from a relatively shorter time period.
But here, acquiescence is not part of the equation.  Neither
Congress nor the President has a role when a state court creates
a new tort, as Texas did here in 1954.  Therefore, it cannot be
argued that the federal elected branches somehow acquiesced in
the tort.  (This said, acquiescence might possibly be relevant
when it comes to a federal statute that gives plaintiffs a basis
for seeking remedies that would otherwise be for the federal
Executive Branch to pursue.  Such a statute might be thought of
as displacing the Executive's Article II power.  See, e.g.,
TransUnion, 141 S. Ct. at 2207; see also Sierra, 996 F.3d at
1133 (Newsom, J., concurring).  Therefore, acquiescence by the
federal Executive Branch in such a statute, even perhaps over a
relatively tight time period, see Dames & Moore, 453 U.S. at
679, The Pocket Veto Case, 279 U.S. at 689, could potentially
have a role in the standing analysis.)

the longevity analysis, but rather pauses it.

Whether or not it is old enough, the tort at issue here exists, on the Plaintiffs' evidence, in just one jurisdiction. If a one-jurisdiction tort is not prevalent enough to count as traditional, then there is no need for further consideration of whether a 70-year-old tort is old enough.

### B. Prevalence

Can a tort recognized in one state, see Part III.B above, count as traditional?[31]   The Court's answer: no.

This conclusion is based on a Supreme Court decision, see Part III.B.1 below, on the way in which the courts have decided cases in this area, see Part III.B.2 below, and on some more general considerations suggested by the Supreme Court, see Part III.B.3 below. All of this together establishes that for a tort to count as traditional it must be somewhat broadly accepted, not just in a single jurisdiction.

### 1. Sprint Communications

Start with the Supreme Court's decision in Sprint Communications, Inc. v. APCC Services, Inc., 554 U.S. 269 (2008). The question there: does a plaintiff have Article III standing if they have been assigned a legal claim for the purpose of collecting money for the assignor? See Sprint, 554 U.S. at 271.

Answering this question, the Supreme Court sought to determine if there is a "tradition specifically of suits by assignees for collection[.]" Sprint, 554 U.S. at 285. Whether such assignees could sue emerged as a live issue in the 19th century, see id., and the Court looked to that period.

Before taking up the Court's opinion, consider the four-Justice dissent. Among other things, the dissent criticized the majority's analysis of the "historical tradition of assignments," id. at 305 (Roberts, C.J., dissenting), because

---

[31]   To be called traditional, a practice must reach a certain level of prevalence. This is part of what the term means. See, e.g., Tradition, sense I.1.c, Oxford English Dictionary (2023) ("Any practice or custom which is generally accepted and has been established for some time within a society, social group, etc.") (emphasis added).

the cited tradition was too "equivocal."   Id. at 306.

> The majority concedes that "some States during this period
> of time refused to recognize assignee-for-collection
> suits," but that refusal was substantially more widespread
> than the majority acknowledges. . . .
>
> The majority's survey of 19th-century judicial
> practice . . . ignores a substantial contrary tradition
> during this period.  That tradition makes clear that state
> courts did not regularly "entertai[n] suits virtually
> identical to the litigation before us."  In reality, all
> that the majority's cases show is that the question . . .
> was hotly contested --- a live issue that spawned much
> litigation and diverse published decisions.

Id. at 309-10 (cleaned up).

For the dissent, the "unsettled and conflicting state of
affairs" it found in the cases, id. at 311, was not enough to
show that collection lawsuits by assignees were the sorts of
suits that were "traditionally amenable to  .  .  .  the
judicial process[.]"  Id. at 311 (cleaned up).

Now put aside the dissent, and consider the Court's opinion.

"[D]uring the 19th century," the Court stated, "most state
courts entertained suits virtually identical to the litigation
before us: suits by individuals who were assignees for
collection only[.]"  Id. at 280.  In support of this, the Court
analyzed numerous 19th century cases, see id. at 280-81, and
compiled an appendix that listed cases from a large range of
jurisdictions.  See id. at 292-98.  The Court:

> Of course, the dissent rightly notes, some States during
> this period of time refused to recognize assignee-for-
> collection suits, or otherwise equivocated on the matter.
> But so many States allowed these suits that by 1876, the
> distinguished procedure and equity scholar John Norton
> Pomeroy declared it "settled by a great preponderance of
> authority, although there is some conflict" that an
> assignee is "entitled to sue in his own name" whenever the
> assignment vests "legal title" in the assignee, and
> notwithstanding "any contemporaneous, collateral agreement
> by virtue of which he is to receive a part only of the
> proceeds ... or even is to thus account [to the assignor]
> for the whole proceeds." [J. Pomeroy,]Remedies and Remedial
> Rights § 132, p. 159 [1876] (internal quotation marks

omitted; emphasis added).  Other contemporary scholars
reached the same basic conclusion.  See, e.g., P. Bliss, A
Treatise Upon the Law of Pleading § 51, p. 69 (2d ed. 1887)
(stating that "[m]ost of the courts have held that where
negotiable paper has been indorsed, or other choses in
action have been assigned, it does not concern the
defendant for what purpose the transfer has been made" and
giving examples of States permitting assignees to bring
suit even where they lacked a beneficial interest in the
assigned claims (emphasis added)). See also Clark &
Hutchins[, The Real Party in Interest, 34 Yale L.J. 259,
264 (1925)]("[M]any, probably most, American jurisdictions"
have held that "an assignee who has no beneficial interest,
like an assignee for collection only, may prosecute an
action in his own name" (emphasis added)).  Even Michael
Ferguson's California Law Review Comment --- which the
dissent cites as support for its argument about "the
divergent practice" among the courts, recognizes that "[a]
majority of courts has held that an assignee for collection
only is a real party in interest" entitled to bring suit.
See Comment, The Real Party in Interest Rule Revitalized:
Recognizing Defendant's Interest in the Determination of
Proper Parties Plaintiff, 55 Cal. L. Rev. 1452, 1475 (1967)
(emphasis added); see also id., at 1476, n. 118 (noting
that even "[t]he few courts that have waivered on the
question have always ended up in the camp of the majority"
(emphasis added)).

Id. at 281-82 (internal citations omitted).

The back and forth between the dissent and the Court sketched
out above is clarifying.

For the dissent, the requisite tradition could not be
established because there were 19th century cases on both sides
of the question of whether a collection suit by an assignee
could go forward.  See id. at 309-12.

The Supreme Court's response was not to suggest that so long as
"some" 19th century cases supported a suit by assignees, see
id., that was enough.

Rather, the Court worked to show that the "majority" of 19th
century cases held that assignee suits could go forward --- and
this established that assignee lawsuits were sufficiently
traditional for Article III standing purposes.  As quoted
before:

> Of course, the dissent rightly notes, <u>some</u> States during this period of time refused to recognize assignee-for-collection suits, . . . . But so <u>many</u> States allowed these suits that [the practice was deemed] "settled by a great preponderance of authority[.]"

<u>Id</u>. at 281 (cleaned up).

In short: the Court's response to the dissent was not that "some" cases are adequate to help establish standing; rather, the Court's response was that there were not in fact "some" assignee cases, but a "great preponderance" of them.  In turn, this suggests that for the <u>Sprint Communications</u> Court, authority from just "some" jurisdictions was not enough to establish a type of lawsuit as traditional for standing purposes.

This suggestion is buttressed from two different sides.  Consider these in the following sections.

### 2. Method

Note first that as part of assessing whether a tort is traditional for Article III purposes, the Supreme Court and the Third Circuit have consistently relied on particular types of sources.

In <u>TransUnion</u>, <u>see</u> 141 S. Ct. at 2208, and <u>Spokeo</u>, <u>see</u> 578 U.S. at 341-42, for example, the Supreme Court looked to the Restatement (First) of Torts (1938).  Restatements generally aim to "articulate[] the reasoned, mainstream, modern consensus" of our law.  <u>Scampone</u> v. <u>Highland Park Care Ctr., LLC</u>, 618 Pa. 363, 403 (2012); <u>cf</u>. <u>Wallach</u> v. <u>Eaton Corp.</u>, 837 F.3d 356, 367 (3d Cir. 2016); David Gruning, <u>Pure Economic Loss in American Tort Law: An Unstable Consensus</u>, 54 Am. J. Comp. L. 187, 190 (2006).

Similarly, the Third Circuit has frequently cited in this area the Restatement (Second) of Torts (1977).  See <u>Huber</u>, 84 F.4th at 154; <u>In re Nickelodeon Consumer Priv. Litig.</u>, 827 F.3d 262, 293 (3d Cir. 2016).  The Restatement sections cited by the Third Circuit collect cases from many jurisdictions --- from more than 20 state and territories, <u>see</u> Restatement (Second) of Torts § 525 (1977) (cited in <u>Huber</u>); from more than 35, <u>see</u> <u>id</u>. § 549 (cited in <u>Huber</u>); and from more than 20, <u>see</u> <u>id</u>. § 652B (cited in <u>In re Nickelodeon Consumer Priv. Litig.</u>).

The Third Circuit has also cited Section § 652A of the online version of the Restatement (Second) of Torts.  See <u>In re Horizon</u>

Healthcare Servs. Inc. Data Breach Litig., 846 F.3d at 638.
The current, updated version of § 652A cites cases from more
than 35 states and territories.  See Restatement (Second) of
Torts § 652A (2023) (online version).

A final example: the Third Circuit has looked to the Handbook of
the Law of Torts on the tort of abuse of process.  See Grasso,
2023 WL 4615299, at *2.  The Handbook cites cases from more than
thirty states and territories.  See 1 William L. Prosser,
Handbook of the Law of Torts 892-96.

Bottom line: assessing what is traditional in this context, the
Supreme Court and the Third Circuit have looked to sources that
largely aim to describe the consensus view of American law as it
exists across many jurisdictions.  This broad-gauge approach is
consistent with a focus on the state of the law in general ---
and not just the law as it might exist here and there, in a
small set of jurisdictions.

### 3. "American Courts"

Step back now and consider why, per the Supreme Court, there is
a focus on what is traditional in this area.

Standing doctrine is rooted in Article III's invocation of
"Cases" and "Controversies."  And the Supreme Court has
indicated that the meaning of those terms can be understood, to
an extent, by looking to the sorts of cases and controversies
that "American courts"[32] have, in fact, historically handled.

> [H]istory is particularly relevant to the constitutional
> standing inquiry since, as we have said elsewhere, Article
> III's restriction of the judicial power to "Cases" and
> "Controversies" is properly understood to mean "cases and
> controversies of the sort traditionally . . . resolved by,
> the judicial process."

Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens, 529 U.S.
765, 774 (2000) (quoting Steel Co., 523 U.S. at 102).

Because the doctrine of standing derives from the case-or-

---

[32] For use of this phrase by the Supreme Court in this context,
see TransUnion, 141 S. Ct. at 2204, 2206, 2208, 2209, 2210 n.6,
2213, and see Spokeo, 578 U.S. at 341.

controversy requirement, and because that requirement in turn is grounded in historical practice, it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts.

Spokeo, 578 U.S. at 340-41.

In short: the Supreme Court has (1) focused on what has "traditionally been regarded as . . . a basis for a lawsuit" in "American courts," as (2) a way to shed light on what the Constitution means by "Cases" and "Controversies."[33]

Take each of these two parts separately.

As to the first: to determine whether a tort ("a basis for a lawsuit") has been "traditionally" established within "American courts," it does not make sense to look to a tort that is established in only a few courts. An "American court[]" that alone or virtually alone recognizes a particular tort is not proceeding in a way that is "generally accepted"[34] by the broader body of "American courts." Quite the opposite.

As to the second point: the Supreme Court has indicated it assesses what is traditional in this area to help clarify what is included within Article III's "Cases" and "Controversies." But why, then, look to torts that are largely off on their own, recognized only in a smattering of jurisdictions here and there? Such torts are by definition obscure. They say something about the types of cases and controversies that have occasionally been "resolved by[] the [American] judicial process." Steel Co., 523 U.S. at 102. But they have little to say about the heartland of what "American courts" have widely (and publicly[35]) been

---

[33] The Supreme Court's approach may be related to "liquidation," a doctrine recently discussed by the Supreme Court, see Noel Canning, 573 U.S. at 525, and associated most prominently with James Madison in Federalist Number 37 and Chief Justice Marshall. See generally William Baude, Constitutional Liquidation, 71 Stan. L. Rev. 1 (2019).

[34] Tradition, sense I.1.c, Oxford English Dictionary (2023) ("Any practice or custom which is generally accepted and has been established for some time within a society, social group, etc.") (emphasis added).

[35] Cf. Baude, Constitutional Liquidation, 71 Stan. L. Rev. at 18-

understood to do --- and therefore they do not shed meaningful
light on what Article III should be taken to mean when it
invokes "Cases" and "Controversies."

### 4. Conclusion: Unreasonable Debt Collection is Not Prevalent Enough

In sum: a tort embraced in only a very small number of
jurisdictions does not count as traditional.[36]

This is suggested by the back-and-forth between the Court and
the dissent in Sprint Communications, see Part IV.B.1; by the
way the Supreme Court and the Third Circuit have proceeded in
this area, see Part IV.B.2; and by the reason the Supreme Court
has said it looks to the traditional practices of "American
courts," see Part IV.B.3.

Where does all this leave the Plaintiffs?

They have shown only that the tort of unreasonable debt
collection was established by the Texas Supreme Court in 1954.
See Part II. But to make their chosen argument[37] work, the
Plaintiffs needed to demonstrate the tort is a traditional cause
of action in American courts. This required the Plaintiffs to
establish, at a minimum, that a meaningful number of courts have
recognized the tort. They have, instead, come forward with only
one. This is not enough.

### V.    Conclusion

On the Plaintiffs' standing argument, the question is whether
the tort of unreasonable debt collection is traditional. See
Part II. Per the Plaintiffs' evidence, the tort is 70 years old
and exists in one jurisdiction. See Part III. Regardless of
whether 70 is old enough to count, see Part IV.A, a tort that

---

21.

[36] Cf. Ward v. Nat'l Patient Acct. Servs. Sols., Inc., 9 F.4th
357, 362 (6th Cir. 2021) (conducting a Transunion Article III
analysis and describing the relevant tort as "recognized in most
states"); Patel v. Facebook, Inc., 932 F.3d 1264, 1272 (9th Cir.
2019) (describing the relevant tort as recognized "in the great
majority of the American jurisdictions that have considered the
question") (cleaned up); Perry v. Cable News Network, Inc., 854
F.3d 1336, 1341 (11th Cir. 2017) (same).

[37] See footnote 9.

exists in only one jurisdiction is not prevalent enough to be traditional.  See Part IV.B.  Accordingly, the Plaintiffs have not carried their burden to establish standing.

The Defendant's motion to dismiss for lack of subject matter jurisdiction will be granted as to the Plaintiffs, by a separate order to issue today.

DATE: November 27, 2023

_____
Michael E. Farbiarz, U.S.D.J.

27

Appendix A

As to the point in footnote 9, collected here are some references to the Plaintiffs' Opposition to Motion to Dismiss: at 6 ("the common law intentional tort of unreasonable debt collection is closely related to the FDCPA and allows for nominal damages for the invasion of the right to be free from unreasonable debt collection.  Therefore, Plaintiff's intangible harm is concrete."); id. at 13 ("The common law analogue here is the tort referred [sic] either as unreasonable debt collection or unreasonable collection methods."); id. ("As an intentional tort, a plaintiff is entitled to nominal damages . . . . Thus, both the tort and the FDCPA provide a remedy for the invasion of the legally protected interest without proof of a tangible harm."); id. at 15 ("[U]nreasonable debt collection is the common law analogue for Plaintiffs' FDCPA claims and . . . is an intentional tort for which a plaintiff may recover nominal damages without any proof of additional harm."); id. ("despite the obvious connection between the intentional tort of unreasonable debt collection and the FDCPA, we have found no decision in which that tort was either raised or addressed as the common law analogue supporting the concreteness of an intangible harm from a debt collector's violation of the Act"); id. ("The intentional tort of unreasonable debt collection, with its allowance for nominal damages in the absence of proof of a tangible harm, establishes that the invasion of a consumer's legally protected interest under the FDCPA is itself a concrete harm."); id. ("The Common Law Analogue: The Intentional Tort of Unreasonable Debt Collection"); id. at 17 ("the Plaintiffs identify the intentional tort known as unreasonable debt collection or unreasonable collection methods."); id. at 18 (introducing supporting cases with "[h]ere are some examples of actionable claims arising from this tort"); id. at 23 (describing the tort); id. at 25 ("Just as the intentional tort of unreasonable debt collection applies to a variety of circumstances . . . , the FDCPA applies to the same variety."); id. at 30 ("The right to be free from coercive collection methods is embodied in the common law intentional tort of unreasonable debt collection and in the FDCPA.  Both the tort and the FDCPA provide a remedy for the invasion of that right in the form of nominal damages in the absence of actual damages. Therefore, the invasion of the Plaintiffs' rights protected under the FDCPA is concrete after due consideration of Congress's judgment and the common law analogue.").